# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SETH TAYLOR[1]; JACOB COBOS, by and through his parents, Ralph and Adrienne Cobos; LACY CORMAN, by and through her Parents, Gary and Ladonna Corman; ARIELLE GREEN, by and through her parents, Joseph and Socorro Green; and REED MAY, by and through his parent, Bruce and April May**,

       Plaintiffs[2],

vs.                                                  Case No. 10-cv-606 LFG/ACT

**ROSWELL INDEPENDENT SCHOOL DISTRICT and MICHAEL GOTTLIEB, in his capacity as Superintendent of Schools for Roswell Independent School District,**

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Roswell Independent School District's and Michael Gottlieb's *Motion for Summary Judgment to Dismiss Count III: Violation of the Right to Equal Protection under the Fourteenth Amendment* [Doc. 53]; *Defendants' Motion for Summary Judgment as to Counts I and II of Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief* [Doc. 55]; and *Plaintiffs' Motion*

---

[1] Primarily because he has graduated from, and no longer attends, Goddard High School, Seth Taylor is the subject of Defendant's *Motion for Summary Judgment to Dismiss Plaintiff Seth Taylor's Claims.* [<u>See</u> Docs. 58, 59]. For reasons that will become clear throughout this *Memorandum Opinion and Order,* the Court will deny that motion as moot.

[2] Kyrah and Mikaylah Graham, who originally were named as Plaintiffs and brought suit by and through their parent, Damon Graham, were dismissed as parties to the proceeding by a stipulated order entered by this Court on June 14, 2011. [<u>See</u> Doc. 46].

*for Summary Judgment* [Doc. 57], all of which were filed July 15, 2011; and Defendant's *Motion for Summary Judgment to Dismiss Plaintiff Seth Taylor's Claims* [Doc. 58], filed July 16, 2011.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that oral argument is unnecessary.  Based on the parties' submissions, the Court grants Defendants' *Motion for Summary Judgment to Dismiss Count III: Violation of the Right to Equal Protection under the Fourteenth Amendment* and *Defendants' Motion for Summary Judgment as to Counts I and II of Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief* [Doc. 55], and denies as moot *Plaintiffs' Motion for Summary Judgment* [Doc. 57] and Defendants' *Motion for Summary Judgment to Dismiss Plaintiff Seth Taylor's Claims* [Doc. 58].

## I.   **BACKGROUND**

The following facts and allegations are taken primarily from the *Second Amended Complaint for Declaratory and Injunctive Relief* and other pleadings and are either undisputed or, for purposes of Defendants' summary-judgment motions, viewed in a light most favorable to the non-moving Plaintiffs, with all reasonable inferences being drawn in their favor.  See <u>Faustin v. City, County of Denver</u>, Colorado, 268 F.3d 942, 947 (10th Cir. 2001).

Plaintiffs Seth Taylor; Jacob Cobos; Lacy Corman; Arielle Green; and Reed May are, or at all relevant times were, students at Roswell High School and Goddard High School, two public high schools in Roswell, New Mexico that, along with a number of additional public schools, make up Defendant Roswell Independent School District ("RISD" or "the district").

2

Defendant Michael Gottlieb is, and at all relevant times, was, RISD's Superintendent of Schools. [Doc. 34 at 3-5].

Plaintiffs are members of Relentless in Roswell ("Relentless"), a religious youth group that is not affiliated with any school, but is a ministry of Church on the Move, also of Roswell.  Plaintiffs contend that, as a result of their sincerely held religious convictions, they believe that God called upon them to reach out to their fellow students, teachers, and others by engaging in various acts of kindness and charity, including the dissemination of food and other items to members of their school community. [See Doc. 34 at 5].  The present litigation is the result of Plaintiffs' distribution efforts conflicting with Defendants' policies, detailed much more fully below, that, briefly stated, require prior approval of certain on-campus student distributions.

In accordance with their beliefs and convictions, on or about November 13, 2009, Plaintiffs distributed chicken salad sandwiches, free of charge, to faculty members at both Roswell and Goddard High Schools. [Doc. 34 at 5].  Plaintiff Reed May states that one purpose of the distribution was to "bless the staff for doing what they do every day; dealing with students and all the responsibilities of a teacher . . . [j]ust to give it to 'em and just to bless 'em." [Doc. 54; Exh. B, May depo. at 65-66].  Reed testified that the idea for the sandwich distribution came from Relentless' youth pastor, Tim Aguilar. [Id.; Exh. B, May depo. at 66].  Pastor Aguilar testified that, while Plaintiffs *themselves* might not have sought prior approval before handing out the sandwiches, he knew that he personally, along with some other adults, requested and received permission to do so. [Id.; Exh. A, Aguilar depo.

3

at 114-118].  No plaintiff was ever disciplined or reprimanded as a consequence of the sandwich distribution. [Id.; Exh. A, Aguilar depo. at 120-121; Exh. B, May depo. at 70].

Thereafter, on or about December 11, 2009, Plaintiffs distributed hot chocolate to Roswell and Goddard High School students and teachers. [Doc. 34 at 5-6].  As with the sandwich distribution, it is not entirely clear whether permission was sought and/or obtained for the passing out of the hot chocolate, but it is undisputed that plaintiffs were not stopped from handing out the hot chocolate, nor was any plaintiff disciplined or reprimanded as a result. [See Doc. 54, Exh. A at 122-123; Exh. B, May depo. at 70-72].

One week later, on or about December 18, 2009, Plaintiffs, again free of charge, passed out to the Roswell and Goddard High School communities candy canes with a religious message attached that explained the significance of the color and shape of the confection.  The message read:

> The Story of the Candy Cane is a myth, but what the myth represents is true—Jesus Christ did die for our sins. It began with a stick of pure white hard candy to symbolize the Virgin Birth and sinless nature of Christ.
>
> It's shape represents the staff of the "Good Shepherd" with which He reaches down into the ditches of the world to lift out the fallen lambs who, like all sheep, have gone astray.
>
> The flavor of peppermint is similar to the herb Hyssop which symbolizes the purity of Jesus and the sacrifice He made. Three small red stripes were added to represent the wounds Jesus suffered on His way to the cross. It also represents the Trinity: one God, who is represented in three ways: the Father, the Son, and the Holy Spirit.

[Doc. 34 at 6].  While Plaintiffs neither sought nor obtained approval to distribute the candy

canes, it is undisputed that no plaintiff was ever prevented from distributing the candy canes nor disciplined or reprimanded for having done so. [Id. at 6].

The next month, on or about January 22, 2010, Plaintiffs distributed painted "affirmation rocks."[3]  One side of the rocks offered a message of optimism, such as "U are wonderful." The other side said simply, "Psalm 139." [Doc. 34 at 6].  Plaintiffs handed out the rocks free of charge to students and faculty at Roswell and Goddard High Schools, having neither sought nor received permission for the distribution.  Notwithstanding, it is undisputed that no plaintiff was disciplined or reprimanded in connection with the affirmation-rock distribution. [Id.].

On or about January 29, 2010, Plaintiffs attempted to distribute small rubber figurines which, at approximately 2 inches in height, were represented as being the actual size and weight of a developing fetus at 12 weeks' gestation.  A Scriptural message on one side of a card attached to the figurines read:

> For you formed my inward parts; You wove me in my mothers womb. I will give thanks to You, for I am fearfully and wonderfully made; Wonderful are your works, And my soul knows it very well." Psalms 139:13-14.

[Doc. 26; Exh. 2].  The back of the card contained contact information for the Chaves County Pregnancy Resource Center which, like Relentless, is a ministry of Church on the Move.

---

[3]  Affirmation rocks are generally described as smooth, small river stones with an encouraging or positive word or message inscribed in ink or marker.  The purpose of the stone is to remind, encourage, or affirm a positive message.

That information stated:

> If you have any questions or need counseling please come by or call Chaves County Pregnancy Resource Center 2003 S. Main (575) 623-1217 [o]r contact your school counselor[.] (actual size and weight of a 12 week old baby).

[Doc. 26; Exh. 2].

Pastor Tim Aguilar, a non-student, helped Relentless members at Goddard High School distribute their figurines within the school. [Doc. 84; attached Taylor depo. at 28]. The Goddard distribution began at approximately 7:30 a.m., before classes started. [Doc. 54; Exh. M, Taylor depo. at 45-47]. Tables were set up inside the school's entry so as to facilitate the distribution, and with arriving students funneling their way inside the school and stopping to receive the fetus representations, there was resulting hallway congestion.

Between the two institutions, there are approximately 2,500 students at Roswell High School and Goddard High School. [See Doc. 54 at 14]. Although it was the plan that each student receive a rubber figurine, not long after the distribution began and due to the disruption resulting from students' tossing the figurines at each other and down the halls, Brian Luck, an assistant principal at Goddard High School, informed Seth Taylor, Reed May, and other Relentless members handing out the figurines in the Goddard lobby that, "It's time to shut this down. . . . Some people are getting offended." [Doc. 34 at 8; Doc. 54; Exh. H, Luck depo. at 37-38]. Mr. Luck then took the remaining figurines to his office and told the Relentless students to retrieve them at the end of the day. [Doc. 54 at 15]. Mr. Luck and Seth Taylor both estimated that this occurred at approximately 7:30 a.m., as students were arriving

6

at school but before the beginning of any instructional time. [See id.; Exh. H, Luck depo. at 38; Exh. M, Taylor depo. at 45]. While Mr. Luck testified that Relentless members were not blocking the lobby doors, and that students who chose not to accept a figurine "did have the opportunity to respectfully deny and walk past." [Id.; Exh. H, Luck depo. at 37, 39]. Nonetheless, there was congestion in the entryway caused by the funneling effect of students lining up at the tables. Reed May testified that one of the group's goals was to interact with as many students as possible. [Id.; Exh. B, May depo. at 21]. To that end, Reed estimated that he personally handed out "a couple hundred" figurines, and Seth Taylor believed he "passed out at least a hundred to 150 of them." [Id.; Exh. B, May depo. at 21; Exh. M. Taylor depo. at 74].

As for similar activity at Roswell High School, Roswell Principal Ruben Bolanos testified that he was not on campus the morning of January 29, 2010, but received a phone call from either Mr. Luck or Michelle Edgett, another Goddard High School assistant principal, asking if there was a "situation" at Roswell. [Doc. 54; Exh. C, Bolanos depo. at 13]. After what he described as a "very brief conversation" with whichever assistant principal contacted him, Principal Bolanos called Roswell High School security guard, Junior Polanco, and instructed him to take and secure the figurines "[i]f it's a disruption to the educational process." [Id.; Exh. C, Bolanos depo. at 13-14]. When questioned at his deposition, Principal Bolanos could not remember if the rubber figurines had in fact become a disruption. [Id.; Exh. C, Bolanos depo. at 14].

Approximately two weeks later, on February 11, 2010, Plaintiffs, "believing that they had both a constitutional right and a Christian duty," attempted to pass out the rubber figurines once again. [Doc. 34 at 9]. However, that morning, Ms. Edgett announced over the public address system to the Goddard student body that, "Nothing is to be passed out that is not school related. This is school policy. Anything that is going to be passed out needs to be approved. This is your last warning. If this doesn't stop now there will be disciplinary actions taken." [Id.]. Similarly, at Roswell High, Principal Bolanos sent an email to faculty explaining that, "This email is to make you AWARE that some students could be distributing rubber fetuses. PLEASE if you see this action, confiscate the fetuses and then send those handing them out to Ms. Garnett and Mr. Tillman." [Id. (emphasis in original)].

February 11, 2010 was the last Thursday before Valentine's Day, and Plaintiffs who were Roswell High students assert that, while they were called to the assistant principal's office and asked to turn over their rubber figurines, other students who were not Relentless members were free to hand out Valentine's Day cards, stuffed animals, and boxes of candy. [Id. at 9-10]. Later in the day, Principal Bolanos met with Relentless members and explained, among other things, that prior approval was required before distribution of the rubber figurines would be permitted. [Id. at 10]. According to Seth Taylor, however, Relentless was never told that members could not distribute the figurines and understood only that the items were confiscated "because kids were getting upset." [Doc. 54; Exh. M; Talyor depo. at 79].

8

At some point over the course of the next few weeks, RISD Superintendent of Schools (and Defendant) Michael Gottlieb met with Principal Bolanos; Goddard High School principal Andrew Sweet; additional school administrators; Church on the Move's senior pastor, Troy Smotherman; and others.  It is undisputed that "at that meeting, there was a discussion that the Relentless group implement a less controversial message of abstinence." [Doc. 38 at 9].  Indeed, Pastor Aguilar, who was not in attendance but learned of the meeting after the fact, testified that he understood that Superintendent Gottlieb suggested to Pastor Smotherman that Relentless "just put these babies in their backpacks, and then just kind of keep it low, under wraps . . . without the big to-do. . . ." [Doc. 54; Exh. A, Aguilar depo. at 191].  This caused Pastor Aguilar to believe that Superintendent Gottlieb "was kind of encouraging [Relentless] to go about it in another way." [Id.; Exh. A, Aguilar depo. at 191-192].  There was no resolution at the meeting, however, as to the prior-approval issue. [Doc. 34 at 11].

Thereafter, on February 26, 2010, Relentless students at both Roswell and Goddard High Schools distributed wristbands printed with the message, "I'm Worth Waiting For." [Doc. 34 at 11].  According to Plaintiffs, Relentless members at Roswell High School were "able to pass their wristbands out freely and without interference from school officials, despite having neither sought nor obtained prior approval for the distribution." [Id. at 12]. While it is undisputed that Seth Taylor and another Goddard High student received one-day suspensions in the form of "Saturday school," following their handing out of the wristbands, Goddard principal Andrew Sweet testified that Seth was not suspended for his distribution

9

efforts but, instead, for "[c]ontinued noncompliance" with Goddard High School's prior-approval/distribution policy. [Doc. 54; Exh. G, Sweet depo. at 75-78].

Over the remainder of the 2009-2010 school year, Relentless conducted a number of additional distributions, including (1) stickers with the message, "Jesus loves St. Patrick," in March 2010; (2) plastic Easter eggs with the message, "Life is fragile like an egg. How are you going to protect it?" and a citation to Proverbs, also in March 2010; (3) pencils with the message, "I can do all things in Christ,"[4] in May 2010; and (4) dog tags with the message, "Let us not grow weary in our well doing,"[5] also in May 2010. [Doc. 54 at 21-22; Doc. 78 at 12]. It is undisputed that there were no reports of disruptions relating to the distributions of the stickers, pencils, or dog tags, and that Roswell High administrators facilitated the Easter egg distribution by setting up tables and chairs for the students. [Doc. 54 at 21-22; Doc. 78 at 12].

At the beginning of the 2010-2011 school year, on September 3, 2010, Plaintiffs left approximately 1,000 Krispy Kreme donuts in the faculty lounges of both Roswell and Goddard High Schools. [Doc. 34 at 16; Doc. 54 at 22]. On top of the boxes was a sticker with a Relentless logo and a quotation from Galations 6:9, "Let us not grow weary in well doing." [Doc. 34 at 16; Doc. 54 at 22]. It is undisputed both that (1) the donuts were left in the faculty lounges "surreptitiously," and (2) students are not allowed in the faculty lounges without permission. [Doc. 54 at 22; Doc. 78 at 12]. Although all donuts but those already

---

[4] *Philippians* 4:13.

[5] *Galatians* 6:9.

consumed were removed from the teachers' lounges due in part to "food safety concerns," [Doc. 54 at 22], no plaintiff was reprimanded for the donut distribution and only one non-plaintiff student was disciplined for having accessed a faculty lounge after having previously been warned not to do so. [Id. at 23; Doc. 78 at 12].

As previously stated, the crux of this litigation is the intersecting of Plaintiffs' distribution activities with Defendants' district-wide policies, three of which are relevant here: (1) an unwritten but "long-standing custom and practice" requiring prior approval for the distribution of non-school related materials on school grounds ("the standard practice") [see Doc. 54 at 6; Doc. 78 at 3]; (2) Policy 7110, captioned "Advertising, Solicitations, etc.," which provides, in pertinent part, that "[p]romotional activities must be approved by the school principal[]" ("the promotional policy") [Doc. 26; Exh. 3; Doc. 34 at 13; Doc. 54, Exh. K]; and (3) Policy 5195, captioned "Distribution of Non School Sponsored Literature," which was adopted by RISD on or about May 11, 2010 and provides, in pertinent part, that students wishing to distribute "[a]ny non-school sponsored literature" must first secure approval from the school administration, and that approval may be withheld if administrators reasonably believe, among other things, that distribution "[w]ould cause a substantial disruption of or a material interference with the normal operation of the school or school activities[]" ("the distribution policy").  [Doc. 34 at 15; Doc. 38 at 12; Doc. 54, Exh. J at 1].

11

## II.    PROCEDURAL HISTORY

On June 23, 2010, Plaintiffs, pursuant to 42 U.S.C. § 1983, filed their *Complaint for Injunctive Relief and Damages*.  [See generally Doc. 1].  Plaintiffs amended their complaint on November 12, 2010, [see Doc. 26], and  amended it a second time on February 24, 2011. [Doc. 34].  Plaintiffs' *Second Amended Complaint for Declaratory and Injunctive Relief* eliminated their earlier request to recover damages from both defendants.  [See Docs. 29, 32]. The *Second Amended Complaint* includes three counts.  In Count I, Plaintiffs assert a claim for a violation of their right to free speech under the First Amendment to the United States Constitution.  [Doc. 34 at 17-18].  In Count II, Plaintiffs assert  a "hybrid" claim based upon the alleged violation of their rights to free speech and the free exercise of religion. [Id. at 19-20].  Finally, in Count III, Plaintiffs contend that Defendants violated their right to equal protection under the Fourteenth Amendment by treating religious speech and literature differently from how they treat secular speech and literature. [Id. at 20-21].

On July 15, 2011, Defendants filed the motions for summary judgment that are currently before the Court. [See Docs. 53, 55].  In support of their *Motion for Summary Judgment to Dismiss Count III: Violation of the Right to Equal Protection under the Fourteenth Amendment*, Defendants argue that (1) nothing in the record supports Plaintiffs' claim that Defendants treated religious materials and speech differently from secular materials and speech; (2) Plaintiffs are unable to point to any similarly situated group or individual who was treated differently from how Plaintiffs were treated; and (3) Plaintiffs cannot show that Defendants acted with discriminatory intent. [Doc. 54 at 28].  Defendants

further contend that the district practices and policies in question reflect content-neutral approaches to student distribution of non-curriculum related materials on school grounds. [See id. at 29-31].

Similarly, in *Defendants' Motion for Summary Judgment as to Counts I and II of Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief*, RISD and Superintendent Gottlieb maintain that (1) they acted within constitutional bounds to the extent they restricted student expression they reasonably believed likely to materially and substantially disrupt school operations; (2) the evidence of record fails to support a determination that Defendants were motivated by a desire to suppress Plaintiffs' religious beliefs; and (3) the district policies in question are facially valid. [See Doc. 56 at 27-46].

## III.   ANALYSIS

### A.   Standard of Review: Summary Judgment

Summary judgment under Fed.R.Civ.P. 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In support of its assertion that a fact "cannot be . . . genuinely disputed[,]" the movant must

> cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> . . .
> show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

13

Fed.R.Civ.P. 56(c)(1).  When a motion for summary judgment is properly made and supported, in other words, when the moving party makes a *prima facie* showing, an opposing party may not rely merely on allegations or denials in its own pleading but, instead, must set out specific facts by way of affidavit, deposition testimony, or answers to interrogatories showing a genuine issue for trial.  See United States ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 958 (10th Cir. 2008).  Judgment is appropriate as a matter of law if the nonmoving party fails to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial.  See Celotex, 477 U.S. at 324.  At this stage, it is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather than resolving factual disputes, the Court's function is to determine whether there are disputes that should be resolved by the factfinder.  The Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**B.**    **42 U.S.C. § 1983**

As is relevant here, Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.  [See Doc. 34 at 2]. Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Section 1983 is not an independent font of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver, 510 U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir.2002). Accordingly, an analysis of a federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, Plaintiffs allege in Count I that Defendants violated their First Amendment right to freedom of speech by (1) preventing them from distributing their materials to fellow students during non-instructional time; (2) discriminating against them on the basis of the content of their message; and (3) discriminating against them on the basis of the religious viewpoint of their speech or expression. Plaintiffs maintain that the district's

actions and policies amount to impermissible prior restraints on speech, and that they are overly restrictive, as well as irrational and unreasonable.  [Doc. 34 at 17-18].

In Count II, Plaintiffs assert a claim for a "hybrid" violation of their rights to free speech and the free exercise of religion as guaranteed by the First Amendment, alleging that Defendants' actions and policies (1) substantially burden Plaintiffs' sincerely held religious beliefs; (2) are neither neutral nor generally applicable inasmuch as Defendants prevent Plaintiffs from distributing their materials and items (namely, the rubber figurines with attached Biblical message) while allowing other students' materials to be freely handed out; and (3) are not narrowly tailored restrictions on Plaintiffs' constitutional rights. [Doc. 34 at 19].

In Count III, Plaintiffs submit that Defendants violated their Fourteenth Amendment right to equal protection under the laws by (1) treating religious speech and literature in a manner different from how they treat secular speech and literature; and (2) treating Plaintiffs differently from other similarly situated individuals and groups on the basis of Plaintiffs' religious viewpoints and expression. [Doc. 34 at 20].

## C.     Count I: Claimed Violation of Freedom of Speech under the First Amendment to the United States Constitution

The Free Speech clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST. amend. I.  It is well-established that, "even in light of the special characteristics of the school environment . . . [n]either students [n]or teachers shed their constitutional rights

to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). At the same time, however, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986). Accordingly, any consideration of the extent of those rights must be undertaken within the particular framework of the public-school setting. See Tinker, 393 U.S. at 506.

Three main types of speech tend to occur within a school environment. The first type is "[s]tudent speech that 'happens to occur on the school premises. . . .'" Fleming v. Jefferson Cnty. Sch. Dist. R-1, 298 F.3d 918, 923 (10th Cir. 2002). The Tenth Circuit defines "student speech" as "pure student expression that a school must tolerate unless it can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" Id. (quoting Tinker, 393 U.S. at 514). The second type of speech likely to occur in the school setting is government speech, an example of which would be "the principal speaking at a school assembly." Id. In determining that speech is or is not "government speech," courts look to whether (1) the central purpose of the speech or expression is to promote the views of the government or of the private speaker; (2) the government has exercised editorial control over the content of the speech or expression; (3) the government is the literal speaker; and (4) ultimate responsibility for the speech or expression rests with the government. Id. (citing Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1141 (10th Cir.2001)).

17

Finally, between "student speech" and "government speech" falls "school-sponsored speech," which is student speech that a school "affirmatively . . . promote[s]" rather than merely tolerates.   Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270-271 (1988). "School-sponsored speech" includes "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."   Id. at 271.   "School-sponsored speech" or activities encompass expression or "activities [that] may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences."   Id.   The speech at issue is best characterized as pure student speech that just happens to occur on school premises.   See Fleming, 298 F.3d at 923.

Two dominant approaches have emerged for purposes of analyzing students' First Amendment free-speech claims.   Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1225 (10th Cir. 2009).   One approach derives from Tinker, in which high school students who wore black arm bands to school to protest ongoing hostilities in Vietnam were suspended pursuant to a quickly adopted district policy forbidding such attire.   Tinker, 393 U.S. at 504.   The United States District Court for the Southern District of Iowa dismissed the students' § 1983 complaint and the Court of Appeals for the Eighth Circuit affirmed, but the United States Supreme Court reversed and remanded, holding that school officials may not deny student expression absent the existence of facts that might reasonably lead them "to

18

forecast substantial disruption of or material interference with school activities" as a result of that expression. Tinker, 393 U.S. at 514. Rather than causing—or threatening to cause—disorder, commented the high court, "the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it." Id. at 505.

The second approach is distilled from Hazelwood, in which staff members of a high school newspaper alleged that their First Amendment rights were violated when school administrators withheld from publication two pages of articles authored by students as part of their journalism class. The United States District Court for the Eastern District of Missouri conducted a bench trial, following which it concluded that no First Amendment violation occurred, since school officials could justifiably impose restraints on students speech in activities that were integral to the school's educational function, so long as the officials' decision rested on a substantial and reasonable basis. See Kuhlmeier v. Hazelwood Sch. Dist., 607 F.Supp. 1450, 1466 (E.D. Mo. 1985).

The Eighth Circuit reversed and, relying on Tinker, held that in addition to being a part of the school, the school newspaper also constituted a public forum, meaning that school officials could not censor its contents except when necessary to avoid a material and substantial interference with school work, discipline, or the rights of others. Kuhlmeier v. Hazelwood Sch. Dist., 795 F.2d 1368, 1372-74 (8th Cir. 1986).

19

The Supreme Court reversed, explaining that the student newspaper, which was not meant to be open to indiscriminate use, was not a public forum but, instead, was reserved by school officials for its intended purpose as a supervised learning experience for journalism students.   Hazelwood, 484 U.S. at 270.  For this reason, continued the Court, "school officials were entitled to regulate the contents of [the student newspaper] in any reasonable manner[, and it was] this standard, rather than . . . Tinker, that govern[ed the] case."  Id. Further distinguishing the two approaches, the Court explained that the issue in Tinker was "educators' ability to silence a student's personal expression that happens to occur on the school premises."  Id. at 270-271.  By contrast, the issue in Hazelwood was "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."  Id. at 271.

In the instant action, Plaintiffs assert that the district's standard practice and its solicitation and distribution policies violate their First Amendment rights in that they (1) amount to unconstitutional prior restraints on Plaintiffs' speech; (2) are vague; (3) are not the least restrictive means of accomplishing any permissible government purpose; and (4) "unconstitutionally chill and abridge" Plaintiffs' right to communicate freely with fellow students. [Doc. 34 at 18].  More specifically, Plaintiffs contend that

> Policy 5195, Policy 7110, and the Standard Practice are all facially unconstitutional because they are prior restraints on the constitutionally protected speech of students in the District and they vest unbridled discretion in the hands of government officials, whereby they may discriminate against Plaintiffs or

other disfavored speakers based on the content or viewpoint of
their speech.

[Doc. 84 at 21].  Defendants do not contest that the policies in question restrict student

speech; they assert, however, that the policies are "constitutionally legitimate restraints" that

are both reasonable and permissible in light of the special characteristics of the school

environment. [Doc. 56 at 41; Doc. 97 at 2].[6]

"The term prior restraint is used 'to describe administrative and judicial orders

forbidding certain communications when issued in advance of the time that such

communications are to occur.'"  Alexander v. United States, 509 U.S. 544, 550 (1993)

(quoting M. NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03, p. 4–14 (1984)).  A prior

restraint is a regulation or other government mandate that "[gives] public officials the power

to deny use of a forum in advance of actual expression."  Southeastern Promotions, Ltd. v.

Conrad, 420 U.S. 546, 553 (1975).  Because "the danger of censorship and of abridgment of

our precious First Amendment freedoms is too great where officials have unbridled

discretion over a forum's use[,]" id., content-based prior restraints on speech are generally

disallowed and presumptively invalid.  See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377,

382-383 (1992).  Still, the presumptive invalidity of such a regulation may be overcome if

the regulation, when "subjected to the most exacting scrutiny[,]" Boos v. Barry, 485 U.S.

---

[6] In considering the legitimacy of the policies' restrictions, Defendants urge the application of a
forum analysis, [see Doc. 56 at 39-46], while Plaintiffs insist that such an analysis is both inapplicable
and inappropriate under the circumstances and, instead, submit that the Court should hold Defendants to
"the high burden of proof required under Tinker." [Doc. 84 at 52].  For purposes of making as complete a
record as possible, the Court considers the facts both under Tinker and through a forum analysis.

312, 321 (1988), (1) serves a compelling governmental interest; (2) is necessary and precisely tailored to serve that interest; and (3) is the least restrictive means readily available for that purpose.  See Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2nd Cir. 2005).

By contrast, a less stringent test of "intermediate scrutiny" applies to a regulation of expressive activity that is *not* based on content.  Such a content-neutral regulation will be upheld if it (1) serves a substantial government interest and (2) is narrowly drawn to serve that interest without unnecessarily interfering with First Amendment freedoms.  Doe v. Shurtleff, 628 F.3d 1217, 1223 (10th Cir. 2010) (internal quotations omitted).

Neither R.A.V. nor Shurtleff, however, involved student speech or otherwise demanded resolution "in light of the special characteristics of the school environment." Hazelwood, 484 U.S. at 266.  To be sure,

> [a] prior restraint policy affecting private speech must comport with Tinker, 393 U.S. at 509, 89 S.Ct. 733.  Thus, a school may exercise prior restraint upon a student's private literature "distributed on school premises on school hours in those special circumstances where [the school] can reasonably forecast substantial disruption of or material interference with school activities on account of the distribution of such printed material."

Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F.Supp.2d 98, 124 (D.Mass. 2003) (*quoting* Quarterman v. Byrd, 453 F.2d 54, 58-59 (4th Cir. 1971).  While "school officials' 'undifferentiated fear or apprehension' of a disturbance is not enough to overcome a student's right to freedom of expression[,]" officials need not wait for an actual disruption or interference to occur and, instead, may act to prevent problems before they arise.  West

v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1366-67 (10th Cir. 2000) (*quoting*

Tinker, 393 U.S. at 508).

Thus, prior incidents of racial harassment, which resulted in the creation of a district-wide policy prohibiting the possession of "any written material, either printed or in [a student's] own handwriting, that is racially divisive or creates ill will or hatred" were sufficient in West to justify the suspension of a middle school student, T.W., who drew a Confederate flag at the alleged urging of his friend.[7]   West, 206 F.3d at 1365-67.  The fact that T.W.'s drawing did not cause a disturbance or disruption did not prevent school administrators from taking action where past racially related episodes, some of which were related to the Confederate flag and included hostile confrontations between groups of white and black students at school and a fight at a high school football game, gave administrators "reason to believe that [T.W.'s] display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone."  Id. at 1366; see also

---

[7]  The district-wide policy on "Racial Harassment and Intimidation" in West provided, in relevant part, that

> [d]istrict employees and student(s) shall not racially harass or intimidate another
> student(s) by name calling, using racial or derogatory slurs, wearing or possession of
> items depicting or implying racial hatred or prejudice. District employees and students
> shall not at school, on school property or at school activities wear or have in their
> possession any written material, either printed or in their own handwriting, that is racially
> divisive or creates ill will or hatred. ( Examples: clothing, articles, material, publications
> or any item that denotes Ku Klux Klan, Aryan Nation-White Supremacy, Black Power,
> Confederate flags or articles, Neo-Nazi or any other "hate" group. This list is not
> intended to be all inclusive). Violations of this policy shall result in disciplinary action by
> school authorities. For students there will be a three day out-of-school suspension for the
> first offense with a required parent conference prior to readmittance. . . .

West, 206 F.3d at 1361.

<u>B.W.A. v. Farmington R-7 Sch. Dist.</u>, 554 F.3d 734, 738-741 (8th Cir. 2009) (suspension of high school student who wore clothing depicting Confederate flag did not work violation of her free-speech rights where school officials, based on evidence of racial tension, banned such attire so as "to prevent anticipated future disruptions"); and <u>Scott v. School Bd. of Alachua Cnty.</u>, 324 F.3d 1246, 1247-50 (11th Cir. 2003) (same).

By contrast, where the evidence was insufficient to support a finding that school officials "reasonably forecasted that any disruption or disorder would result" from high school bible club members' dissemination of religious literature and items, officials could not rely on <u>Tinker</u> to justify their prohibition of the students' distributions.  <u>See</u> <u>Westfield High Sch. L.I.F.E. Club</u>, 249 F.Supp.2d at 111-113; <u>see also</u> <u>T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.</u>, --- F.Supp.2d ----, 2011 WL 3501698, at *9-14 (N.D.Ind. Aug. 10, 2011) (<u>Tinker</u> standard not satisfied where there did not exist a "reasonably foreseeable chance of future substantial disruption" as a result of students' online posting of "raunchy" photographs for which they posed).

Assuming without deciding that <u>Tinker</u> applies under the circumstances of the present case,[8] the Court concludes that Defendants acted within constitutional bounds in stopping Plaintiffs from distributing their rubber-fetus figurines in light of the substantial disruption that the initial, January 29, 2010, distribution clearly caused.  It was unnecessary to wait and

---

[8] "'[T]ime, place, and manner' is the proper standard for evaluating *content and viewpoint neutral* regulations of student speech[, but] when a school imposes *content or viewpoint based* restrictions the court will apply <u>Tinker</u>."  <u>Morgan v. Plano Indep. Sch. Dist.</u>, 589 F.3d 740, 745 (5th Cir. 2009) (emphasis added).  Again, for purposes of making a complete record, the Court analyzes Plaintiffs' First Amendment claims both under <u>Tinker</u> and within a forum-analysis framework.

see if new disruptions of the type that caused such turmoil in January would reoccur; instead, it was reasonable to anticipate such disruptions.

In addition to undisputed testimony from school administrators, Plaintiffs' own witnesses testified as to the disruption caused by the presence of the figurines. [See Doc. 54; Exh. Q, Renteria depo. at 25 (Q: Okay. So you knew from the first distribution that it caused disruption at Roswell High School. A: Correct)]. Courtney Renteria testified to her belief that "the babies were more of a disruption [than any of Relentless' previous distribution efforts] because they were rubber and a lot of kids decided to pull them apart." [Id.; Exh. Q, Renteria depo. at 36].

Seth Taylor testified that, as of the time he left Goddard High School at 12:30 on January 29, 2010, "[t]here was a lot of kids that had taken the babies and done inappropriate things with them[,]" which Seth agreed would have been disruptive to the educational process. [Doc. 54; Exh. M, Taylor depo. at 62]. Seth stated that he understood from various classmates that students were (1) pulling the heads off the figurines; (2) inverting the figurines so as to make them resemble penises; and (3) throwing the figurines at the school's "popcorn" ceilings, causing them to become stuck overhead. [Id.; Exh. M, Taylor depo. at 61-63]. Seth stated that he had heard that students were "just tearing [the ruber fetuses] apart, defiling the bodies I guess of them." [Id.; Exh. M, Taylor depo. at 61]. Notwithstanding that he left Goddard around lunch time on January 29, 2010, Seth testified to his belief that the "defiling" of the figurines "[m]ost likely" continued into the afternoon, and admitted that such actions during classroom time would constitute a disruption and also

interfere with school instruction. [Id.; Exh. M, Taylor depo. at 76, 87].

School administrators and other school actors presented equally—if not more—compelling testimony as to the substantial disruption and material interference caused by the presence of the rubber figurines. Raul Castro, a security officer at Roswell High School, testified that on January 29, 2010, he observed students throwing the rubber fetuses and pulling the heads off the figurines. [Doc. 54; Exh. O, Castro depo. at 26, 29]. Mr. Castro confirmed that "one of the kids was wearing [a figurine] right here in front of his penis, hanging right in front here, and they had the head that was hanging."[9] [Id.; Exh. O, Castro depo. at 26]. He also stated that he was called to "different classes" in response to teachers' complaints that students were throwing the figurines. [Id.; Exh. O, Castro depo. at 29]. In short, Mr. Castro testified that the day "was really a disaster with them things there." [Id.; Exh. O, Castro depo. at 29].

---

[9] It is not entirely clear from the record whether it was following the January 29, 2010 distribution, or the February 11, 2010 distribution (or even both) that a student hung a rubber fetus from his pants zipper. While Mr. Castro's testimony indicates that this incident occurred on January 29, Andrew Sweet wrote in a March 3, 2010 memorandum to Assistant Superintendent Robert Kakuska that this episode took place on February 11 (and actually involved several students). [See Doc. 54; Exh. T at 2].

The precise date of the occurrence, however, is of little relevance, given the Court's determination that the initial distribution of rubber fetuses on January 29, 2010 caused a substantial disruption to the school day. Thus, if the incident took place on January 29, it is reasonably viewed as just one more event that, when combined with the others to which witnesses testified, resulted in disorder at school that day. See Tinker, 393 U.S. at 514. If it took place on February 11, it serves as additional justification for Defendants' prohibiting the dissemination of rubber fetuses in order "to prevent anticipated future disruptions." B.W.A., 554 F.3d at 741.

P.J. Garnett, an administrator at Roswell High, testified that

> [t]he problem with the rubber fetuses . . . the kids didn't know [what] to do with 'em.  We had 'em stuck on pencils.  We had their heads torn off.  We had 'em stuffed down toilets, you know, plugging up the toilets.
> . . .
> [A] couple of teachers called the office and said, these kids are throwing 'em around in my classroom.  We found—a couple of students took 'em out into the fire lane and put hand sanitizer on 'em, and lit them on fire to watch 'em blow.
>
> And the whole point was the kids didn't know the meaning behind them, and it was a disruption when you're attempting to teach and this head goes across the classroom, or kids are throwing 'em into the wastebasket.

[Doc. 54; Exh. N, Garnett depo. at 49-50].

As to what was occurring at Goddard High School, Michelle Edgett testified to students "yelling back and forth at each other" as to their "strong feelings both ways" on the topic of abortion, a discussion of which was not a part of teachers' planned lessons for the day.  [Doc. 54; Exh. D, Edgett depo. at 30, 71].  She stated that students were throwing headless rubber figurines at each other, saying "here's what an abortion looks like."  [Id.; Exh. D, Edgett depo. at 70].  As a further "disruption [to] the educational process[,]" Ms. Edgett described a delay in delivering students to classrooms as they "argue[d] back and forth about the merits of rubber fetuses on campus [that] morning."  [Id.; Exh. D, Edgett depo. at 31-32].  Ms. Edgett also confirmed that students were throwing the rubber fetuses at ceilings in both classrooms and hallways to see if they would stick.  [Id.; Exh. D, Edgett depo. at 106].

27

Similarly, Sharon Bell, a German teacher at Goddard, testified that she took approximately 8 to 10 minutes "each class period" to deal with the issue of the rubber fetus figurines, speaking "openly and honestly" to her students to address their concerns that other students were disrespectfully tearing the figurines apart and even lighting them on fire. [Doc. 54; Exh. L, Bell depo. at 23-24].   The time spent in these discussions reduced planned teaching time on the day's school calendar and obviously delayed and interfered with the scheduled educational agenda.

Andrew Sweet testified that English and Science classes at Goddard High School were disrupted when students became so focused on the rubber figurines in their midst that teachers were unable to deliver the day's planned lessons. [Doc. 54; Exh. G, Sweet depo. at 25-26].   Noting that the day began with "non-school personnel . . . on campus conducting the distribution with students[,]" Mr. Sweet opined that, as the day wore on, there was an 'escalation of disruption to the educational process.   It wasn't . . . one single event." [Id.; Exh. G, Sweet depo. at 37-38].

At the request of Assistant Superintendent Robert Kakuska, Mr. Sweet described in a memorandum dated March 3, 2010 the environment of disruption that was created at Goddard High School as a result of the presence of the rubber figurines. [Doc. 54; Exh. T, memo. of March 3, 2010].   Among other things, Mr. Sweet explained that, on January 29, 2010: (1) an advanced placement senior English class was unable to continue, "as several students who were in possession of the rubber babies had begun dismembering the babies, physically removing the heads [from] the torsos, and announcing to others in the class that

28

such was the process for conducting an abortion[;]" (2) an honors freshman English class "was unable to undertake the scheduled assessment . . . because students had become engaged in name calling and insults between those identifying themselves as pro-life and those identifying themselves as pro-choice[;]" (3) a "major challenge" presented itself in a freshman Science class when several students pulled the rubber figurines apart and threw the pieces at each other; and (4) a foreign-language teacher voiced frustration over what she perceived as the weekly presence of a different item in her class, including the rubber figurines, "which was serving to focus the attention of students away from the delivery of instruction." [Id.; Exh. T. memo. of March 3, 2010 at 1-2].

Even in the face of this evidence and testimony, Plaintiffs continue to hold fast to their assertion that, after January 29, 2010, "it had not been incontrovertibly established that [their] distribution of the rubber babies had caused any material and substantial disruption. . . ." [Doc. 84 at 51]. Instead, Plaintiffs point repeatedly to the fact that Brian Luck told members of Relentless that "we're going to have to shut this down . . . you know, people are being offended by what they see." [See, e.g., id. at 8, 14, 29, 39, 46, 47, 59, 60, 66]. While there is no dispute that Mr. Luck did indeed make such a statement, Plaintiffs go so far as to submit that "Assistant Principal Luck's *only* reason for stopping Relentless from continuing the distribution was that 'some people are being offended by what they see.'" [Id. at 66 (emphasis added)]. However, Plaintiff's assertion in this regard is simply not supported by the record. In addition to the evidence of substantial disruption as testified to by then-Relentless members Courtney Renteria and Seth Taylor; and Raul Castro;  P.J. Garnett;

29

Michelle Edgett; and Sharon Bell; and as memorialized in Andrew Sweet's memorandum to Mr. Kakuska, Mr. Luck also testified that, just prior to telling Relentless that he was going to have to shut down their distribution of January 29, 2010, he

> came left out of the stairwell [and saw] something come out of the commons area hallway, what looked like a rubber ball; then another rubber ball looking thing. I had a couple of students approach me and say, do you see what they're doing down there? And I said, I see it, and I'm going to take care of it. It was the heads of the little babies that—the little fetuses that were being launched in the area against the wall.

[Doc. 54; Exh. H at 39-40].[10]

Notwithstanding Plaintiffs' insistence that Mr. Luck's statement proves that student offense was the sole reason for stopping Relentless' rubber-fetus distribution, this Court is "obligated to examine the record as a whole . . . and evaluate what the school actually did, as opposed to carving out an isolated statement from the record." Fleming, 298 F.3d at 931 (examining and reviewing entire record—rather than exclusively accepting school official's statement as to non-school related nature of project taking place on school property—in determining that project did, in fact, bear imprimatur of school). A review of the record as a whole in this matter reveals that school officials stopped the January 29, 2010 dissemination of the rubber figurines because the figurines were being used to create a

---

[10] Interestingly, Andrew Sweet testified that, as a result of reports of rubber fetus-related classroom disruptions he received "throughout the morning on the 29th [of January,]" he ultimately directed Ms. Edgett and Mr. Luck to "please confiscate these items." [Id.; Exh. G, Sweet depo. at 25-26]. One reasonable inference to be drawn from Principal Sweet's testimony in this regard is that he, and not Assistant Principal Luck, is the one who made the actual decision to stop the figurine distribution.

substantial disruption and material interference with school activities, inasmuch as (1) students were both destroying and defiling them, and (2) the presence of these objects was preventing delivery of classroom instruction at a number of grade levels and in a variety of subjects.  Indeed, even the distribution process itself, conducted at tables inside the school entryway, caused students to funnel into the halls, resulting in congestion.  Given the undisputed evidence, no reasonable jury could find otherwise.  Moreover, on the basis of the substantial disruption that occurred on January 29, 2010, the Court concludes that Defendants were justified in prohibiting the second distribution on February 11, 2010.  See West, 206 F.3d at 1366-67 (where school officials have "reasonable basis for forecasting disruption," fact that conduct in question might not have yet resulted in  actual disruption does not mean officials lack authority to act).

The Court's ultimate conclusion is the same when the facts are viewed through a "forum analysis" lens.  Having already determined, as explained more fully above, that the speech at issue here is best categorized as pure student speech that just happens to occur on school premises, see Fleming, 298 F.3d at 923, the Court's next step in conducting a forum analysis is to determine which of the traditionally recognized types of fora best describes Roswell and Goddard High Schools.  See Axson-Flynn v. Johnson, 356 F.3d 1277, 1284-85 (10th Cir. 2004).

The United States Supreme Court has identified the following distinct categories of government property: (1) traditional public fora; (2) designated public fora[11]; (3) limited public fora; and (4) nonpublic fora. See Hawkins v. City and Cnty. of Denver, 170 F.3d 1281, 1286 (10th Cir. 1999); see also Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009). Traditional public fora are "places which by long tradition or by government fiat have been devoted to assembly and debate," and include such sites as streets, sidewalks, and parks. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983); see also Hawkins, 170 F.3d at 1286. The government's ability to restrict speech in traditional public fora is limited, and depends upon whether the restriction is content-based or content-neutral. Hawkins, 170 F.3d at 1286. If content-based, the government must show that the restriction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry, 460 U.S. at 45. By contrast, a content-neutral time, place, and manner restriction will be upheld if it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." Id.

In a nonpublic forum, "the government retains the right to curtail speech so long as those curtailments are viewpoint neutral and reasonable for the maintenance of the forum's particular official uses." Summum v. City of Ogden, 297 F.3d 995, 1002 (10th Cir. 2002).

---

[11] Neither Plaintiffs nor Defendants contend that the high schools in question constitute designated public fora. Instead, Defendants contend that the schools should be deemed nonpublic fora, [Doc. 56 at 39-41], and Plaintiffs argue that, while forum analysis is inappropriate under the circumstances, if applied, the Court should view the schools as public fora. [Doc. 84 56-57]. Because the schools' classification as designated public fora is, therefore, not an issue, the Court does not discuss the concept other than to state that a designated public forum has been defined as one that the state creates by intentionally opening a non-traditional forum for public discourse. See Hawkins, 170 F.3d at 1286.

A limited public forum is a subset of the more broadly defined nonpublic forum, the former being created "where the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum.'" Shero v. City of Grove, Okl., 510 F.3d 1196, 1202 (10th Cir. 2007) (quoting Summum, 297 F.3d at 1002 n. 4). Like those imposed in a nonpublic forum, government restrictions on speech in a limited public forum need "only be reasonable in light of the purpose served by the forum and be viewpoint neutral." Shero, 510 F.3d at 1202.

It is well-established that "public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Hazelwood, 484 U.S. at 267 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)); see also, e.g., M.A.L. ex rel. M.L. v. Kinsland, 543 F.3d 841, 846 (6th Cir. 2008); Bannon v. School Dist. of Palm Beach County, 387 F.3d 1208, 1212 (11th Cir. 2004); Axson-Flynn, 356 F.3d at 1285; Campbell v. St. Tammany Parish Sch. Bd., 231 F.3d 937, 941 n.9 (5th Cir. 2000). Indeed, for student safety and school-discipline concerns, a school campus is generally no open to the public. Visitors must generally "check in" with school administrators and be authorized to enter the school building. See, e.g., Mnyofu v. Board of Educ. of Rich Tp. High Sch. Dist. 227, Cook County, Ill., 2007 WL 1308523 (N.D.Ill. Apr. 27, 2007).

Notwithstanding, Plaintiffs urge the Court to find that Roswell and Goddard High Schools are, in fact, public fora because, as Plaintiffs are (or, at the relevant times, were) students, they are (or were) required by law to be at school. [Doc. 84 at 86-87 ("[S]hould the

33

Court determine that forum analysis is appropriate, it should find that for students required

to attend school, the hallways and school campus constitute[] . . . at least a public

forum. . . .")].  According to Plaintiffs, "[l]ong-standing Supreme Court case law supports

such a conclusion." [Doc. 84 at 56].  As evidence of such support, Plaintiffs point to <u>Jamison</u>

<u>v. State of Tex.</u>, a case involving the right to distribute religious-related handbills on public

streets, in which the Supreme Court held that

> one who is rightfully on a street which the state has left open to
> the public carries with him there as elsewhere the constitutional
> right to express his views in an orderly fashion. This right
> extends to the communication of ideas by handbills and
> literature as well as by the spoken word.

<u>Jamison v. State of Tex.</u> 318 U.S. 413, 416 (1943).  The problem, however, is that Plaintiffs

have altered[12] the above quotation in an attempt to force it to fit their position and, in so

doing, effectively erase <u>Hazelwood</u>'s proclamation that "public schools do not possess all

of the attributes of streets, parks, and other traditional public forums. . . ."  <u>Hazelwood</u>, 484

U.S. at 267.  As school administrators are charged with responsibilities of educating students

in a safe and secure environment, the right that a student possesses to leaflet, march, protest,

or speak on a public sidewalk off school grounds simply does not exist in an unbridled

---

[12]  With Plaintiffs' bracketed alterations, the <u>Jamison</u> quotation reads:

> [O]ne who is rightfully on a street [or in a hallway] which the state has
> left open to the public [or required students to be present] carries with
> him there as elsewhere the constitutional right to express his views in an
> orderly fashion. **This right extends to the communication of ideas by
> handbills and literature as well as by the spoken word**.

[Doc. 84 at 56 (emphasis by Plaintiffs)].

fashion while that student is on school grounds.   Thus, the Court is unpersuaded by Plaintiffs' reliance on Jamison.

Alternatively, Plaintiffs ask the Court to deem each of the two high schools at issue "at least a limited public forum. . . ." [Doc. 84 at 56].  However, as previously explained, a limited public forum is merely "a subset of the nonpublic forum classification."  Summum, 297 F.3d at 1002 n.4.  As such, government restrictions on speech in a limited public forum are subject to the same level of review as those curbing speech in a nonpublic forum—they need only be viewpoint neutral and reasonable.  See id. at 1002.  In effect, then, Plaintiffs advocate a level of scrutiny no different from that deemed applicable by Defendants, and under which the district may impose time, place, and manner restrictions on student  speech "so long as those restrictions are viewpoint neutral and reasonable in light of the school's interest in the effectiveness of the forum's intended purpose."  M.A.L. ex rel. M.L. v. Kinsland, 543 F.3d 841, 847 (6th Cir. 2008).  Accordingly, with these standards in mind, the Court now turns to a consideration whether the challenged policies in question survive constitutional muster.

While the policies in question—the standard practice, Policy 7110, and Policy 5195—must be reasonable and must not discriminate against speech based on viewpoint, see Good News Club v. Milford Central Sch., 533 U.S. 98, 99 (2001), they "need not be the most reasonable or the only reasonable limitation[s]."  Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 808 (1985).  Among the panoply of reasonable justifications for restricting student speech on school premises are (1) teaching the "values of a civilized

social order[,]" <u>Bethel</u>, 478 U.S. at 683; (2) shielding students from exposure to sexually explicit, indecent, vulgar, or lewd speech, <u>see</u> <u>id.</u> at 684; (3) maintaining school security and order, <u>see</u> <u>id.</u> at 868; (4) preserving a proper educational environment and preventing its disruption, <u>see</u> <u>Muller by Muller v. Jefferson Lighthouse Sch.</u>, 98 F.3d 1530, 1541-42 (7th Cir. 1996); and (5) "assur[ing] that school hours and school property are devoted primarily to education[ and] preserv[ing] some trace of calm on school property." <u>Bystrom By and Through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14</u>, 822 F.2d 747, 750 (8th Cir. 1987). Additionally, in a case with facts not unlike those presented here, the United States District Court for the District of Colorado upheld a district-wide distribution policy limiting student distributions to an area outside the school building as a reasonable means of preventing congestion, confusion, tardiness, and clutter. <u>See</u> <u>Hemry by Hemry v. Sch. Bd. of Colorado Springs Sch. Dist. No. 11.</u>, 760 F.Supp. 856 (D.Colo. 1991).

In this case, Policy 5195 (which commits to writing the district's standard practice) allows students to possess and distribute (*i.e.*, disseminate more than 10 copies) non-school sponsored materials, so long as the Assistant Superintendent for Instruction reasonably determines that those materials (1) would not substantially disrupt or materially interfere with school activities; (2) do not depict sexual conduct, violence, or morbidity; (3) are not potentially offensive, profane, obscene, or inappropriate for the school environment; (4) are not libelous or violative of another's right to privacy; (5) are not false, misleading, or misrepresentative; (6) do not demean any racial, religious, or ethnic group; and (6) do not encourage a violation of federal, state, or local laws. [Doc. 54; Exh. J at 1]. Policy 5195 is

36

utterly devoid of any language that might reasonably suggest that it is directed at any specific viewpoint, or religious belief, or that it reflects RISD's disagreement with the message that any student speech might convey.

The steps to be followed in making a request to distribute non-school sponsored literature—and in challenging the denial of any such request— are clearly spelled out on the face of the policy. See Westfield High Sch. L.I.F.E. Club, 249 F.Supp.2d at 124 ("To limit the stifling of free expression, school policies acting as prior restraints on private speech must comport with constitutional limitations . . . and must contain procedural safeguards in an effort to minimize the adverse effect of prior restraint. . . .").

First, "[a]ny non-school sponsored literature" that a student wishes to distribute must be submitted to the Assistant Superintendent for Instruction in a request that includes the name of the sponsoring person or organization. [Doc. 54; Exh. J at 1].  The Assistant Superintendent then has up to five days to review the material before granting or denying the request.  No matter the ultimate decision on the request, the Assistant Superintendent "shall state the reasons in writing whether approved or disapproved." [Id.; Exh. J at 1].

Policy 5195 then plainly describes the appeals process a student may invoke in the event his or her request to distribute non-school related literature is denied.  As an initial step, the student may, within five days of the denial, present a written appeal to the Superintendent, in which the student "shall include the grounds on which [he or she] relies to support the distribution" of the materials in question. [Doc. 54; Exh. J at 1].  The Superintendent "shall reply in writing within five (5) school days." [Id.; Exh. J at 1].  A

dissatisfied student then has five more school days to appeal to the Board of Education, again providing the factual grounds on which he or she relies in support of his or her distribution request. The Board of Education is then required to provide a hearing within 10 school days and to make a decision at its next regular meeting. [Id.; Exh. J at 1].[13]

With respect to approved disseminations, Policy 5195 allows the Assistant Superintendent for Instruction to "designate a time, location and means by which the distribution may take place." [Doc. 54; Exh. J at 1]. The policy furthers mandates that the distribution be "orderly and the designated area for distribution shall be kept free of loosely scatter material." [Id.; Exh. J at 1]. Lastly, the policy places on the distributing students the responsibility for cleaning up the area of distribution at the end of the school day. [Id.; Exh. J at 1].

Similarly, the advertising policy, Policy 7110, provides, in relevant part, that "[p]romotional activities must be approved by the school principal[, and that s]chools may not display advertisement nor allow distribution of materials which directly advertise drugs, alcohol, or tobacco." [Doc. 54; Exh. K]. Additionally, under the advertising policy, "[i]tems contributed to the school district become the property of the district. . . . " [Id.; Exh. K]. As with Policy 5195, nothing on the face of Policy 7110 could reasonably be construed as discriminating against a particular message or viewpoint. In fact, Robert Kakuska testified that the reason RISD implemented Policy 7110 was to put an end to on-campus campaigning

---

[13]   In-house policies to resolve disputes concerning federally protected rights have been encouraged and upheld in employment-discrimination cases. See, e.g., Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. Boca Raton, 524 U.S. 775 (1998).

by a local lawmaker "putting up signs with his name on [them]" in an effort to solicit political support. [Doc. 80; attached Kakuska depo. at 7; Doc. 54; Exh. E; Kakuska depo. at 39].

Finally, the district's "standard practice" is not immune from challenge simply because it is unwritten, though its unwritten form is one factor to consider.  See Faustin, 423 F.3d at 1196 n.1 (explaining that Tenth Circuit precedent allows facial challenges to unwritten policies, and further noting that unwritten state of policy is not fatal but "merely a factor to be considered").  Michael Gottlieb, Andrew Sweet, and Robert Kakuska all described the standard practice, which Superintendent Gottlieb explained had been in place the entire 29 years he had been with RISD, as requiring that students obtain prior approval "for distribution of items on . . . campus." [Doc. 54; Exh. G; Sweet depo. at  28; see also id.; Exh. E; Kakuska depo. at 13-16; Exh. F; Gottlieb depo. at 13].  According to Superintendent Gottlieb, "the idea [of the standard practice] is that the administrators need to know what's going on, why it's being passed out and if it needs to be [done in] a certain location. . . ." [Id.; Exh. F, Gottlieb depo. at 13].  Andrew Sweet testified similarly, explaining that the point of the standard practice is to give school officials "some knowledge of what was taking place[, s]o that in the event we had an activity that shouldn't take place we were able to get ahead of that and stop that." [Id.; Exh. G; Sweet depo. at 28].  Robert Kakuska confirmed that, pursuant to the standard practice, "anything coming into the buildings, no matter from what venue, needed to be cleared through the building so we knew what was going on." [Id.; Exh. E, Kakuska depo. at 14].  Mr. Kakuska suggested that any numerical limitation under the

policy was based upon "common sense[,]" and explained that while a student would not require permission to hand out 5 or 10 Valentine's Cards, approval would be required for a school-wide distribution. [Id.; Exh. E, Kakuska depo. at 14-15].

Attacking all three policies, Plaintiffs contend that they (1) vest school administrators with "unbridled discretion to permit or deny the exercise of First Amendment rights[;]" (2) are vague; and (3) are overbroad.  [Doc. 84 at 24, 30-37, 39-43].

With respect to Policy 5195, this Court concludes that written into the policy are adequate procedural safeguards to minimize the adverse effect of any prior restraint.  See Westfield High Sch. L.I.F.E. Club, 249 F.Supp.2d at 124.  For one thing, the policy precisely targets the types of non-school sponsored literature with respect to which the Assistant Superintendent for Instruction may deny distribution approval (e.g., literature that (1) would cause a substantial disruption; (2) is sexually explicit or violent; (3) is libelous, false, or misleading; and (4) demeans particular racial, ethnic, or religious groups). [Doc. 54; Exh. J at 1].  The policy also provides that, if the Assistant Superintendent denies a request for distribution, he or she "shall" state in writing the reasons for the disapproval.  [Id.; Exh. J at 1].  Policy 5195 gives the Assistant Superintendent specific time limits in which he or she must make a decision, and further sets forth a detailed appeals process for any student whose distribution request has been denied.  [Id.; Exh. J at 1].  The approval, review, and appeal processes all comport with traditional procedural due process rights of notice and the right to be heard.  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (fundamental requirement of due process is opportunity to be heard at meaningful time and in meaningful manner).

The Court concludes that these requirements harness any unbridled administrator discretion that school officials might otherwise possess.  See Westfield High Sch. L.I.F.E. Club, 249 F.Supp.2d at 125; see also Morgan, 2010 WL 6367527 (upholding  distribution policy with similar procedural safeguards).

Plaintiffs additionally argue that all three policies vest school officials with unbridled discretion because they are insufficiently inclusive insofar as (1) the standard practice allows officials "wiggle room;" (2) Policy 5195 "was not meant to be all inclusive of the reasons student speech may be restricted[;]" and (3) Policy 7110 uses the catchall "et cetera." [Doc. 84 at 24-28].  Considering the facts of this case, as it must, within the framework of the special environment of the public school, see Hazelwood, 484 U.S. at 266, the Court simply is not persuaded by Plaintiffs' argument.  Plaintiffs cite to absolutely no case law or other authority that supports their position that public-school policies of the sort at issue here must be all-inclusive.  To the contrary, the Seventh Circuit rejected the similar contention

> that a school must spell out in intricate detail precisely what is
> "libelous or obscene language" or an incitement "to illegal acts"
> or an insult "to any group or individuals" or which materials
> "will greatly disrupt or materially interfere with school
> procedures and intrude into school affairs or the lives of others."

Muller, 98 F.3d at 1542.  The circuit's reasoning as to why such a school policy is not void for vagueness was straightforward and sensible and is adopted as the reasoning of this Court:

> [S]chools are different. Their duties and responsibilities are
> primarily custodial and tutelary and thus discretionary in nature,
> not legalistic. An education in manners and morals cannot be
> reduced to a simple formula; nor can all that is uncivil be
> precisely defined. What is insulting or rude very often depends

41

on contextual subtleties. A shockingly indecorous act at the dinner table may be par for the course in the locker room or on the playground. If the schools are to perform their traditional function of "inculcat[ing] the habits and manners of civility," Fraser, 478 U.S. at 681, 106 S.Ct. at 3163, they must be allowed the space and discretion to deal with the nuances. The touchstone is reasonableness. . . .

Id. at 1542-43.[14]

Using reasonableness as a touchstone, the Court cannot agree that, in this case, the district's policies somehow leave students to guess at their meaning. See West, 206 F.3d at 1368 (policy might be void for vagueness "if a reasonable student of ordinary intelligence who read the policy could not understand what conduct it prohibited"). Policy 5195 (and the standard practice, to the extent it is still in use) dictate that students request permission before distributing 10 or more copies of non-school sponsored literature. In support of their argument that "[t]he definition of 'distribution' is vague[,]" [Doc. 84 at 32], Plaintiffs seize on testimony from Superintendent Gottlieb that they say evidences Policy 5195's vagueness for failure to include a "numerical limitation," since "it could be that "the distribution of nine (9) items during the morning, nine (9) more at lunch time, and then nine (9) more in the

_____

[14] Plaintiffs argue that Muller is distinguishable because it involved elementary school students, not high school students. [See Doc. 84 at 55]. Muller admittedly is of limited relevance *to the extent* that the Seventh Circuit commented that the "marketplace of ideas" metaphor, which lends support to free-speech cases arising in high school settings, is less important where the issue is the First Amendment rights of grade schoolers, who are "just beginning to acquire the means of expression" and who attend school at least in part to learn such social niceties as  sitting still and being polite, much more than learning to engage in "robust debate." Muller, 98 F.3d at 1538. However, this Court sees no reason that the Muller court's discussion on the custodial and tutelary role played by public schools should not be more generally applied.

afternoon may be permissible without the need for submitting a request. . . ."[15] [Id. at 32-33]. However, much as Superintendent Gottlieb quickly pointed out that 9 plus 9 totals more than 10, this Court believes that a reasonable high school student of ordinary intelligence would likewise understand that such a distribution would constitute the dissemination of 18 items. To be sure, the Court is confident that such a student would understand that, under Policy 5195, he or she is not to distribute 10 or more copies non-school sponsored literature without first requesting and receiving approval from the Assistant Superintendent of Instruction. See Morgan, 2007 WL 397494, at *12 (determining that "[m]en of common intelligence would understand [that district policies] regulated [distribution of] non-school materials at the specific times and places set out in the policies.").

Nor does the Court agree that the standard practice is unconstitutionally vague. According to Plaintiffs, although "the standard practice provides absolutely no neutral criteria to guide the administration in making a decision on what speech is permissible. . ., [d]istrict officials testified that distributions would not be permitted if they were potentially 'offensive.' What is considered potentially offensive is completely discretionary." [Doc. 84 at 35]. Again, a policy is not necessarily void for vagueness simply because it does not

---

[15] When asked if, in light of the absence of a numerical limitation, Policy 5195 required permission to hand out nine items in the morning and nine more in the afternoon, Superintendent actually testified, "[t]he total's more than ten." [Doc. 72; attached Gottlieb depo. at 99-100]. In response to counsel's follow-up question, "So that definition falls within the policy you need to get prior approval[,]" Superintendent Gottlieb replied, "I would agree with you." [Id.; attached Gottlieb depo. at 100]. Although Superintendent Gottlieb subsequently stated that he would seek advice of counsel in a situation where a student sought to hand out nine items one day, and nine more the following day, the Court does not believe that his testimony is fairly read as an opinion or belief that "it could be that "the distribution of nine (9) items during the morning, nine (9) more at lunch time, and then nine (9) more in the afternoon may be permissible without the need for submitting a request. . . ."   [Doc. 84 at 32-33].

"spell out in intricate detail precisely what is" offensive.  Muller, 98 F.3d at 1542.  In the unique setting that is the public school, so long as they act reasonably, administrators "must be allowed the space and discretion to deal with the nuances" and to address the "contextual subtleties" that they believe render expression that might be acceptable to adults "potentially offensive" to students.  Id. at 1542-53; see also Smith v. Tarrant Cnty. Coll. Dist., 694 F.Supp.2d 610, 628-629 (N.D.Tex. 2010) (explaining that school officials' decisions will govern "if they are within the range where reasonable minds will differ").

As a final argument, Plaintiffs contend that Defendants infringed upon their First Amendment rights when they stopped Plaintiffs' "peaceful distribution" of the rubber figurines in response to reports that unrelated third parties were destroying and causing havoc with them. [See Doc. 84 at 50-51].  As Plaintiffs explain, "[i]f in fact some students dismembered the babies, threw them at others, and otherwise misbehaved, then by all means they should have been disciplined. *But they were not*. Instead, the District let the wrongdoers go and instead penalized *Plaintiffs*. These actions violated the First Amendment." [Id. at 50 (emphasis in original)].  Plaintiffs maintain that Defendants' actions in this regard are "closely akin to the government banning leafletting because of the actions of litterbugs." [Id.].

In support of their argument, Plaintiffs rely on Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth., in which the First Circuit held, in part, that the Massachusetts Bay Transportation Authority's concern that "leafletting causes litter-related hazards" was an insufficient basis upon which to ban noncommercial expressive activity from certain areas

44

of Boston and Boston-area subway stations.   Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth., 984 F.2d 1319, 1324-25 (1st Cir. 1993).   The circuit cited to Schneider v. State for the proposition that "[t]he Supreme Court . . . long has recognized that littering is the fault of the litterbug, not the leafletter [and, therefore, t]he normally appropriate response to problems caused by litter . . . is to punish the litterbug."   Id. at 1324.

In Schneider, the Supreme Court similarly held that the prevention of littering in the streets, which littering was alleged to have been encouraged—though not committed—by the defendants' leafletting, was "insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it."   Schneider v. State, 308 U.S. 147, 162 (1939).

The Court finds both Jews for Jesus and Schneider to be inapplicable to Plaintiffs' situation, since neither one involved conduct occurring within the unique setting of the school environment and conduct occurring on a school campus.   This was, after all, not simply a concern about litter.   The rubber fetuses were causing disruption inside and outside classrooms.   They were being hurled down hallways; stuck on ceilings; and flushed down toilets.   Their presence interfered with instructional time as some teachers were required to take classroom time to deal with issues not on the educational agenda.

In the unique setting of the school environment, viewpoint-neutral restrictions on student speech in the form of leafletting have been upheld as reasonable on the ground that they help to maintain and preserve school order.   See Hemry by Hemry, 760 F.Supp. at 862-863.   Plaintiffs' cited cases also are distinguishable insofar as the Court in Schneider

45

specifically opined that the prevention of littering was insufficient "to justify an ordinance which prohibits a person rightfully *on a public street* from handing literature to one willing to receive it." Schneider, 308 U.S. at 162 (emphasis added).  By contrast, high schools are nonpublic fora, not public fora in the tradition of city streets or town squares.  See Hazelwood, 484 U.S. at 267 ("public schools do not possess all of the attributes of streets, parks, and other traditional public forums. . . ."); see also Krestan v. Deer Valley Unified Sch. Dist. No. 97, of Maricopa Cnty., 561 F.Supp.2d 1078, 1091 (D.Ariz. 2008) (distinguishing Schneider from situation involving litter that resulted from campus leafletting, and remarking that "Schneider did not concern a public high school campus, and in the realm of permissible speech restrictions, context matters.").  The obligations imposed on school administrators to maintain a safe environment for students and to maintain order and enhance the school's primary function are obligations that are without parallel in a town square or off-campus public sidewalk.

Jews for Jesus does not assist Plaintiffs inasmuch as the First Circuit determined, *inter alia*, that the evidence did not support a finding that a ban on leafletting was justified by any perceived threat to public safety, as the transit authority argued.  See Jews for Jesus, 984 F.2d at 1324.  In the instant action, however, Defendants *have* demonstrated that the mass distribution of the rubber figurines caused a substantial disruption to the school environment.  See Tinker, 393 U.S. at 514.  Additionally, if anything, Jews for Jesus would seem to support Defendants' position to the extent that the First Circuit concluded that the prior-authorization requirement of the transit authority's regulation was a content-neutral "time, place, and

manner" restriction that was narrowly tailored to promote the authority's substantial interest in, among other things, securing public safety that might be compromised as a result of "the cumulative effect [of] a number of . . . leafletters converging on the same station. . . ." Id. at 1328.

For all of the above-stated reasons, the Court concludes that each of the three district policies at issue—the standard practice, Policy 5195, and Policy 7110—is viewpoint neutral and serves as a reasonable restriction on the First Amendment right to student speech in the unique setting of a public school.  See, e.g., M.A.L. ex rel. M.L., 543 F.3d at 847. Defendants' motion for summary judgment will be granted with respect to Count I of Plaintiffs' complaint.

### D.    Count II: Claimed "Hybrid" Violation of the Rights to the Free Exercise of Religion and Free Speech under the First Amendment to the United States Constitution

In Count II, Plaintiffs set forth a "hybrid" claim for a violation of their First Amendment rights to free speech and free exercise of religion, arguing that Defendants' policies (1) are neither neutral nor generally applicable to the extent that they "prohibit the handing out of . . . rubber babies with Scripture verses[]" while allowing for the distribution of "other materials[;]" (2) substantially burden Plaintiffs' sincerely held religious beliefs; (3) are neither narrowly tailored restrictions upon Plaintiffs' constitutional rights nor the least restrictive means of accomplishing a permissible government purpose; and (4) are not justified by either a compelling or a significant government interest. [See Doc. 34 at 19].

47

The First Amendment's Free Exercise clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. CONST. amend. I. "While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit [the valid regulation] of religious conduct." Grace United Methodist Church v. City Of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006). Still, "'[d]epending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review.'" Axson-Flynn, 356 F.3d at 1294 (quoting Tenafly Eruv Ass'n., Inc. v. Borough of Tenafly, 309 F.3d 144, 165 (3d Cir.2002)).

It is well-settled that "[n]eutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." Corder, 566 F.3d at 1232. Accordingly, a law or regulation "that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." Id. As the Tenth Circuit has explained, "[a] law is neutral so long as its object is something other than the infringement or restriction of religious practices." Grace United Methodist Church, 451 F.3d at 649-650. By contrast, a law or regulation is not facially neutral if it refers to a religious practice without a secular meaning discernable from the language or context, see Corder, 566 F.3d at 1223, or if it makes "'explicit and deliberate distinctions between different religious organizations.'" Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1259 (10th Cir. 2008) (quoting Larson v. Valente, 456 U.S. 228, 246 n.23 (1982). Additionally, a rule that is discriminatorily

48

motivated and applied to religious conduct is not a neutral rule of general applicability.  See Axson-Flynn, 356 F.3d at 1294.

On the other hand, heightened scrutiny may be appropriate if the party challenging the rule or regulation successfully sets forth a "hybrid rights" claim, meaning the party presents "a free exercise claim [that] is coupled with some other constitutional claim (such [as] a free speech claim)."  Axson-Flynn, 356 F.3d at 1295 (*citing* Emp't Div., Dept. of Human Res. of Oregon v. Smith, 494 U.S. 872, 881-882 (1990).

Notwithstanding that the "hybrid-rights theory has been roundly criticized from every quarter and many have pointed out the danger of interpreting such hybrid-rights claims broadly[,]" Axson-Flynn, 356 F.3d at 1296, the Tenth Circuit does recognize the theory, so long as the plaintiff is able to establish "'at least . . . a colorable showing of infringement of a companion constitutional right.'" Id. at 1295 (*quoting* Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 699 (10th Cir.1998)).  Adopting the Ninth Circuit's definition of "colorable,"[16] for purposes of a "hybrid rights" claim, the Tenth Circuit requires a plaintiff to demonstrate "a fair probability, or a likelihood, of success on the companion claim." Axson-Flynn, 356 F.3d at 1296.

In the instant case, the fact that Plaintiffs do not—for reasons discussed above—prevail on their companion First Amendment free-speech claim is fatal to their "hybrid rights" claim, meaning that they cannot invoke the greater protections of heightened

---

[16]  See Miller v. Reed, 176 F.3d 1202, 1207 (9th Cir. 1999) (defining a "colorable" claim as one with a fair probability or  likelihood (but not a certitude) of success on the merits).

scrutiny.  Instead, the Court evaluates their free-exercise claim under rational-basis review, pursuant to which the Court considers the reasonableness of the district's policies.  See Axson-Flynn, 356 F.3d at 1294.

As an initial matter, the policies in question, which neither refer to a religious practice without a secular meaning discernable from their language or context nor  make explicit and deliberate distinctions between different religious organizations, see Corder, 566 F.3d at 1223; Colorado Christian Univ., 534 F.3d at 1259, are neutral rules of general applicability inasmuch as they require prior approval of (1) the distribution of 10 or more copies of non-school sponsored literature (the standard practice and Policy 5195); and (2) promotional activities (Policy 7110).  These policies are rationally related to the reasonable and legitimate pedagogical concerns of, among other things, (1) protecting students from exposure to indecent, vulgar, or lewd speech; (2) maintaining school security and order; (3) preserving a proper educational environment and preventing its disruption; (4) assuring that school hours and school property are devoted primarily to educational purposes; and (5) preventing congestion, confusion, tardiness, and clutter.

Plaintiffs argue that "Defendants' actions [were] not neutral or generally applicable in that Defendants allow[ed] other materials to be distributed, yet prohibit[ed] the handing out of the rubber babies with Scripture verses."  [Doc. 34 at 19].  The "other materials" to which Plaintiffs refer presumably include "Valentine's Day cards, birthday cards, chocolates,

stuffed animals, and the like. . . ." [Doc. 78 at 16].[17]  Plaintiffs' argument misses the mark in a number of ways.

First, nothing in the record indicates that the schools allow students, "without interference from [school officials] or seeking prior approval[,]" [Doc. 78 at 17], to distribute anything on as massive a scale as Plaintiffs intended with their rubber figurines.  It is undisputed that it was Relentless' hope to distribute a rubber fetus to each student in the Roswell Independent School District. [See Doc. 54; Exh. B, May depo. at 15].[18]  Between Roswell High School and Goddard High School, it is estimated that there are approximately 2,500 students.  [See id., Exh. B, May depo. at 15].  Though Superintendent Gottlieb did testify that, if he were a teacher he might allow students in his classroom to hand out 25 Valentine's Day cards to their friends,[19] he was not asked—nor did he volunteer an opinion as to—what he would do if a student sought to distribute 2,500 Valentine's Day cards. Additionally, Robert Kakuska, upon whose testimony Plaintiffs also rely to support their

---

[17]  The Court assumes that the "other materials" in question are the Valentine's Day cards and related items, and birthday-party invitations that Plaintiffs contend other students were allowed to distribute freely and without interference from school officials.  To the extent that Plaintiffs actually are referring to the non-figurine (and non-disruptive) distribution campaigns they have conducted, those distributions are discussed later in this *Memorandum Opinion and Order*.

[18]  At his deposition, Reed May was asked, "Was it the plan to try to give at least one [rubber fetus] to every student that wanted one at either Goddard or Roswell High?"  Reed responded, "That would have been a good thing.  Realistically I don't think that would have been possible."  Reed continued, however, that, between the two high schools in question, there are approximately 2,500 students, and that one figurine was ordered for each pupil. [Doc. 54; Exh. B, May depo. at 15].

[19]  Interestingly, the question that Mr. Gottlieb was asked was, "if you were a teacher you might allow the distribution of 25 Valentine's Day cards in your classroom *notwithstanding Policy 5195*?" [Doc. 54; Exh. F, Gottlieb depo. at 122 (emphasis added)].  Policy 5195, however, would not prohibit such a distribution outright; instead, Policy 5195 merely dictates that the disseminating students first request and receive permission to hand out their cards. [See id.; Exh. J at 1].

argument, testified that a student wishing to hand out 5 or 10 Valentine's Day cards would not need to seek and obtain prior approval, but if that same student wanted to distribute something to everybody in the school, he would.  [Doc. 54; Exh. E, Kakuska depo. at 15].

Next, there simply is nothing in the record to support a reasonable inference that it was the religious content or component of Plaintiffs' distribution, as opposed to the monumental scale on which it was conducted, that led to its being shut down.  "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  Emp't Div., Dept. of Human Res. of Oregon, 494 U.S. at 879 (internal quotations omitted).  In this case, Plaintiffs maintain that they possess "a sincerely held religious belief that God has called them to serve their fellow students, staff, faculty, and administrators by sharing the gospel of Jesus Christ[]" and, to that end, they engage in such acts of kindness as distributing, free of charge, food; drink; candy and other items to members of the Roswell and Goddard High School communities. [See Doc. 34 at 5-6].  To be sure, both before and after the rubber-figurine distributions, Plaintiffs handed out a variety of items (such as their candy canes; affirmation rocks; wristbands; stickers; Easter eggs; and dog tags), many of which carried a religious message.  Critically, however, not one of these distributions caused a material interference with or substantial disruption to the school environment, and not one was stopped.  It must be remembered that some, if not all, of Relentless's other items also bore a religious or moral message or a

Scriptural reference. Yet only distribution of the rubber figurines caused disorder.[20] That none of Relentless' other religiously inspired distributions caused a disruption, and was therefore stopped, undercuts Plaintiffs' argument that it was the offense taken to the message associated with their rubber figurines—rather than the chaos created by their dissemination—that led to Defendants putting an end to the activity. For the reasons set forth above, the Court determines that Defendants are entitled to summary judgment with respect to Count II of Plaintiffs' complaint.

**E.     Count III: Claimed Violation of the Right to Equal Protection of the Laws under the Fourteenth Amendment to the United States Constitution**

As Plaintiffs' final argument, they contend that Defendants unconstitutionally abridged their right to equal protection of the laws by specifically targeting their religious viewpoints and speech, and by treating such expression differently from how they treat secular expression. [Doc. 34 at 20]. Plaintiffs maintain that Defendants' actions (1) serve neither a compelling nor a significant government interest; (2) are not the least restrictive means of accomplishing any permissible government purpose; (3) do not leave open ample channels of communication; and (4) are irrational and unreasonable. [Id. at 20-21].

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.

---

[20] Plaintiffs' subsequent—and admittedly surreptitious—leaving of approximately 1,000 Krispy Kreme donuts in the Goddard and Roswell teachers' rooms was aborted by school officials both (1) due to concern over food safety; (2) because students are not allowed in the faculty lounges without permission; and (3) because clearly someone had engaged in an unauthorized entry into a faculty lounge. [See Doc. 54 at 22].

CONST. amend. XIV, § 1.A.  The clause "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Accordingly, an individual asserting a denial of equal protection must demonstrate that he was treated differently from others who were similarly situated.  See Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 532 (10th Cir. 1998).  The failure or inability to make such a showing, however, "is fatal to [an] equal protection challenge." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 9 (1st Cir. 2005).

Courts typically will apply one of three levels of review when considering challenges to government actions that allegedly deny equal protection.  "Strict scrutiny" applies where the action in question implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin.  If, however, the challenged action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, a court will apply "intermediate scrutiny."  Finally where the challenged government action does not implicate either a fundamental right or a protected class, courts apply a "rational basis" test. Price-Cornelison v. Brooks, 524 F.3d 1103, 1109-10 (10th Cir. 2008).

Heightened scrutiny may, however, apply even where a government classification is neutral (i.e., does not on it face implicate a protected class) "if the application of that neutral policy has a disproportionate effect on a protected group."  Price-Cornelison, 524 F.3d at 1110 n.3.  But '[i]n order to be entitled to heightened scrutiny . . . , the plaintiff challenging the facially neutral governmental action must also establish that the government was acting with a discriminatory intent."  Id. (citing Village of Arlington Heights v. Metro. Hous. Dev.

54

Corp., 429 U.S. 252, 264-65  (1977)).  To this end, "[i]t is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was *a* motivating factor."  Watson v. City of Kansas City, Kan., 857 F.2d 690, 694 (10th Cir. 1988) (emphasis added).

For the reasons detailed above in Sections II. C. and D., this Court has found that the policies in question do not implicate students' First Amendment rights.  The Court also finds that the policies do not "classif[y] individuals using a suspect classification, such as race or national origin. . . ." Price-Cornelison, 524 F.3d at  1109.  Accordingly, strict scrutiny does not apply.

Nor does the Court deem it necessary or appropriate to accord heightened scrutiny to Plaintiffs' equal protection claim.  Although Plaintiffs argue that Defendants acted with a discriminatory motive in shutting down the rubber-fetus distribution, the undisputed evidence shows otherwise, inasmuch as Relentless members were allowed to distribute a number of other items, including candy canes; pencils; dog tags; stickers; and Easter eggs, all of which came with some sort of religious message attached, but none of which caused a disruption to the school day.  In this regard, Plaintiffs insist that Defendants' non-interference with these other distributions serves as circumstantial evidence that Defendants' decision to halt the rubber-fetus dissemination was motivated by a discriminatory intent to prevent Plaintiffs from spreading a message advocating against abortion. [See Doc. 78 at 24].  According to Plaintiffs, "[t]he only relevant difference between all of the previous distributions and the permitted distributions of other students is that the rubber babies expressed a message that

55

Defendants found *controversial*—that is, someone complained. This alone is sufficient to prove a discriminatory intent." [Id. at 26 (emphasis in original)].  But this view of what sets the rubber-fetus distributions apart from any other Relentless distribution flatly ignores the fact that only the distribution of the rubber figurines caused a substantial disruption to and material interference with the school day. [See Doc. 54; Exh. F, Gottlieb depo. at 32-35 (confirming that no disruptions resulted or were reported as a result of Relentless' distribution of chicken salad sandwiches, candy canes, or affirmation rocks)].

It is additionally undisputed that at the meeting attended by, among others, Superintendent Gottlieb; Principal Bolanos; Andrew Sweet; and Pastor Smotherman, Superintendent Gottlieb suggested to Pastor Smotherman that Relentless "just put these babies in their backpacks, and then just kind of keep it low, under wraps . . . without the big to-do. . . ." [Doc. 54; Exh. A, Aguilar depo. at 191].  When he later heard this, Pastor Aguilar formed the belief that Superintendent Gottlieb "was kind of encouraging [Relentless] to go about it in another way." [Id.; Exh. A, Aguilar depo. at 191-192].  The fact that Andrew Sweet similarly asked Tim Aguilar if it was possible for Relentless to "get [its] message across other than distributing babies" [id.; Exh. A, Aguilar depo. at 177][21] also would seem

---

[21]  According to Pastor Aguilar, at the time Andrew Sweet returned previously confiscated rubber figurines to him, Mr. Sweet asked if there was not "another avenue or way that [Relentless] could get [its] message across other than distributing babies or, you know, *the nature in which we did it*?  Is there some other way we could have done this? *Gotten the message across* the same, basically." [Doc. 54; Exh. A, Aguilar depo. at 177-178 (emphasis added)].  Pastor Aguilar's testimony lends further support to Defendants' position that it was the manner by which it was conveyed, rather than the message itself, that caused school officials to take action.  See, e.g., Cmty. for Creative Non-Violence v. Watt, 703 F.2d 586, 618-619 (D.C. Cir. 1983) (Wilkey, J., dissenting) (First Amendment does not guarantee any right to deliver message in the most effective manner or most convenient way possible), *reversed by* Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288 (1984).

to undercut Plaintiffs' insistence that "[t]he direct evidence in this case unquestionably demonstrates *an intention to discriminate against the message* being expressed with the distribution of the rubber babies." [Doc. 78 at 23 (emphasis in original)].

Finally, Seth Taylor, Courtney Renteria, Jacob Cobos, and Lacy Corman testified that, at various times as students on campus, they had (1) discussed their religious beliefs with friends; (2) talked about their pro-life views with fellow students; (3) championed the virtues of Relentless to other pupils; (4) worn t-shirts bearing the Relentless name and slogan; and (4) prayed, both silently and aloud, all without being reprimanded or told to stop by school officials. [See Doc. 54; Exh. M. Taylor depo. at 24-29; Exh. Q, Renteria depo. at 83; Exh. U, Cobos depo. at 10-12; Exh. V, Corman depo. at 11]. For these reasons, the Court is not persuaded that Plaintiffs demonstrated that Defendants acted out of a discriminatory intent. See Price-Cornelison, 524 F.3d at 1110 n.3 (to be entitled to heightened scrutiny, party challenging the facially neutral governmental action must establish defendant acted with a discriminatory intent). The Court therefore deems rational-basis review to be appropriate here.

As an initial matter, the Court notes that "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike*." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) (emphasis added). Thus, a failure or inability to demonstrate the different treatment of others, *similarly situated*, will doom an equal protection claim. See Barrington Cove Ltd. P'ship v. Rhode Island Housing and Mortg. Fin. Corp., 246 F.3d 1, 7-9 (1st Cir. 2001).

Unfortunately, "[t]he formula for determining whether individuals or entities are 'similarly situated' for equal protection purposes is not always susceptible to precise demarcation." Barrington Cove Ltd. P'ship, 246 F.3d at 8.  On the other hand, a useable rule of thumb

> is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds by* Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004).

In the instant case, the Court has serious reservations as to whether Plaintiffs have shown that, at the relevant times, they were similarly situated to other students in the district. For one thing, the Court finds Plaintiffs' sweeping statement that "[a]ll students in the District are similarly situated under the policies and practices of the District[,]" [Doc. 78 at 18], to be unhelpfully broad.  See Barrington Cove Ltd. P'ship, 246 F.3d at 8 (plaintiff did not establish it was similarly situated to loan coapplicants where plaintiff, having alleged it possessed certain "significant characteristics [failed to] mention whether its coapplicants shared those characteristics.").

For another thing, the only other students to whom Plaintiffs compare themselves are those that handed out Valentine's Day cards and gifts, and birthday-party invitations. [See Doc. 78 at 16-18, 20-21, 24]. But, once again, the most obvious factors that sets apart Plaintiffs' rubber-figurine distribution from distributions of Valentine's Day cards or birthday invitations are (1) the sheer massiveness of the scale of Plaintiffs' operation, the admitted objective of which was to hand out one rubber figurine to each of the 2,500 students in the district's two high schools.; and (2) the potential for disruption. [See Doc. 54; Exh. B, May depo. at 15]. To be sure, rather than simply argue, as Plaintiffs recast Defendants' position, that "the distribution of Valentine's Day gifts and cards, and the distribution of birthday party invitations is completely different than Plaintiffs' distributions[,]" [Doc. 78 at 18], Defendants actually submit that, in comparing their dissemination of 2,500 rubber fetuses to the handing out of Valentine's Day cards, "Plaintiffs ignore the fact that their rubber fetus distribution *was qualitatively and quantitatively different* than any students' distribution of Valentine's Day cards." [Doc. 54 at 31 (emphasis added)].

Defendants' point is well-taken and finds support in the record, through which Plaintiffs simply have not developed any evidence tending to show that other students handed out Valentine's Day cards, gifts, birthday-party invitations, or anything else on as all-encompassing a scale as the one Plaintiffs undertook. Nor have Plaintiffs shown that any other student distribution had as disruptive effect as the rubber-fetus dissemination. Although Plaintiffs maintain that "Seth Taylor's distribution of a rubber baby is the same as Jon Smith's distribution of an invitation to his birthday party[,]" [Doc. 78 at 21], Seth Taylor

did not distribute a single rubber fetus.  To the contrary, Seth himself testified that he passed out between 100 and 150 rubber fetuses, and Reed May testified to his hope that Relentless could have distributed all 2,500 figurines the group had ordered. [Doc. 54; Exh. M, Taylor depo. at 74; Exh. B, May depo. at 15].  It is the immensity of Plaintiffs' distribution, as well as the potential for disruption, that distinguish it from the distribution of Valentine's Day cards and birthday-party invitations.   Additionally, testimony elicited by counsel for Plaintiffs demonstrated that, in an attempt to minimize disruption, prior approval would in fact have been required for any student seeking to distribute a card or other item "to everybody in the school[.]"  [Doc. 54; Exh. E, Kakuska depo. at 15].[22]

As for the *qualitative* differences between Plaintiffs' distribution of the rubber fetuses and other students' distribution of party invitations and Valentine's Day cards and related items, the figurines were attached to a card urging those with questions or a need for counseling to "come by or call Chaves County Pregnancy Resource Center 2003 S. Main

---

[22]   At his deposition, the following colloquy took place between counsel for Plaintiffs and Mr. Kakuska:

> Q:      Yeah. So again, the Valentine's day example I think is a good one.  If I want to hand out five or ten Valentine's Day cards under this procedure the custom, practice, I wouldn't have to get permission—
> A:      Correct.
> Q:      —in advance?
> A:      Correct.
> Q:      But if I wanted to distribute something to everybody in the school, maybe I would?
> A:      Yes, sir.
> Q:      Okay.
> A:      And the reason for that, in my view—*the main reason for that was this disruption stuff*.

[Doc. 54; Exh. E, Kakuska depo. at 14-15 (emphasis added)].

(575) 623-1217." [Doc. 26; Exh. 2].  It was the Chaves County Pregnancy Resource Center that paid for, ordered, and provided Relentless with the rubber fetuses. [See Doc. 54; Exh. B, May depo. at 15 ("A count was taken of the students and we ordered—the Chaves County Pregnancy Resource Center ordered enough to provide for the entire student body.")][23] Given Chaves County Pregnancy Resource Center's connection to and interest in the distribution of the figurines, reasonable school administrators could easily have determined that the attached card amounted to a commercial solicitation, meaning that distribution of the rubber fetuses came within the district's advertising policy, Policy 7110.  Although Plaintiffs apparently do not agree with Plaintiffs' assessment, [see Doc. 84 at 30 n.9], as teaching "'is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges[,]' a court must defer to reasonable educational decisions made by educators." Searcey v. Harris, 888 F.2d 1314, 1319 (11th Cir. 1989) (quoting Hazelwood, 484 U.S. at 273 (alterations added); see also Smith, 694 F.Supp.2d at 628-629 (confirming that school officials' decisions will govern if they are within the range where reasonable minds will differ).  The administrative decisions made by Defendants appear to come within the category of reasonable educational decisions.

Given the qualitative and quantitative differences between Plaintiffs' distribution of rubber fetuses and any other student distributions that can be gleaned from the record, the Court is not persuaded that Plaintiffs have shown that they are similarly situated to, or in all

---

[23] Pastor Aguilar testified similarly. [See Doc. 54; Exh. A, Aguilar depo. at 75 ("Q: [W]ho paid for the rubber fetuses? A: The Chaves County Pregnancy Resource Center.")].  Thus, the handout may well have been part of an advertising campaign.

relevant respects like, other students who have passed out cards, gifts, or other items.  In other words, the Court is not certain that Plaintiffs are comparing apples to apples here.  See Dartmouth Review, 889 F.2d at 19.  Notwithstanding, again in the interest of creating as complete a record as possible, the Court will assume, without deciding, that Plaintiffs are similarly situated to the other students they have identified as comparable, and ask whether Defendants' actions were "rationally related to a legitimate government purpose. . . ." Corder, 566 F.3d at 1234.

The Court concludes that, under the circumstances, Defendants' decision to terminate Plaintiffs' distribution of the rubber fetuses was rationally related to the legitimate government and pedagogical purposes of, *inter alia*, (1) maintaining school security and order; (2) preserving a proper educational environment; (3) preventing the disruption of that environment; and (4) promoting safety by lessening the possibility of injury from flying rubber missiles.  Plaintiffs point out that they were distributing the rubber fetuses during non-instructional time, and challenge Defendants' "assertion concerning the disturbance of *classroom time*. . . ." [Doc. 78 at 1, 25 (emphasis added)].  However, as the Tenth Circuit made clear in Fleming, "'[t]he universe of legitimate pedagogical concerns is by no means confined to the academic . . . [for it includes] discipline, courtesy, and respect for authority.'" Fleming, 298 F.3d at 925 (*quoting* Poling v. Murphy, 872 F.2d 757, 762 (6th Cir.1989)). Having tolerated Plaintiffs' myriad other religiously inspired—but non-disruptive—distributions, both prior and subsequent to their rubber-fetus distribution, Defendants' decision to stop Plaintiffs' massive dissemination of rubber figurines was, under

62

the circumstances presented, rationally related to the legitimate purpose of, among other things, preserving order in the educational environment.  The Court will grant Defendants' motion for summary judgment with respect to Count III of Plaintiffs' complaint.

## IV.    CONCLUSION

There can be no doubt that students are not stripped of their constitutional rights simply by virtue of passing through the door to their public school.  At the same time, once inside, those rights are not necessarily identical to the rights those same students enjoy outside the educational setting.  The short answer as to why this is the case is that "schools are different."  Muller, 98 F.3d at 1543.  The far more comprehensive answer to the same question is set forth above.  In light of the foregoing, the Court will (1) grant Defendants' motions for summary judgment with respect to Counts I, II, and III of Plaintiffs' complaint; (2) deny as moot Defendants' motion for summary judgment to dismiss the claims of Seth Taylor; and (3) deny as moot Plaintiffs' motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that Defendants Roswell Independent School District's and Michael Gottlieb's *Motion for Summary Judgment to Dismiss Count III: Violation of the Right to Equal Protection under the Fourteenth Amendment* [Doc. 53] is **GRANTED;**

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment as to Counts I and II of Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief* [Doc. 55] is **GRANTED;**

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion for Summary Judgment* [Doc. 57] is **DENIED as MOOT**;

**IT IS FURTHER ORDERED** that Defendant's *Motion for Summary Judgment to Dismiss Plaintiff Seth Taylor's Claims* [Doc. 58] is **DENIED as MOOT**;

**IT IS FURTHER ORDERED** that the non-jury trial scheduled for Monday, February 6, 2012 at 9:00 a.m. is hereby **VACATED**;

**IT IS FURTHER ORDERED** that this matter be and hereby is **DISMISSED with PREJUDICE**.

**SO ORDERED** this 23rd day of November, 2011, in Albuquerque, New Mexico.


_____
LORENZO F. GARCIA
UNITED STATES MAGISTRATE JUDGE